IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


LAURAN M. CROWDER                                                    PLAINTIFF


v.                              CIVIL NO. 2:18-CV-2211


ANDREW M. SAUL,[1] Commissioner,
Social Security Administration                                       DEFENDANT


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Lauran Crowder, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claim for supplemental security income (SSI) under the provisions of Title XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

I.      **Procedural Background:**

Plaintiff protectively filed an application for SSI on September 10, 2015, alleging an inability to work since September 10, 2015, due to mental illness. (Tr. 150, 166). The first administrative video hearing was held on November 21, 2016. (Tr. 83-119). Plaintiff testified via video from Russellville. (Tr. 87-98). John Richard Cowell, Plaintiff's uncle, also testified.

---

[1] Andrew M. Saul, has been appointed to serve as Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

(Tr. 99-111). Deborah Steele, Vocational Expert (VE), also testified via telephone. (Tr. 111-118). A supplemental hearing was held on October 31, 2017. (Tr. 122-143). Plaintiff and her attorney appeared, and Plaintiff was the only witness. (Tr. 128-145).

In a written opinion dated April 30, 2018, the ALJ found that Plaintiff had the following severe impairments: borderline intellectual functioning; specific learning disability; attention-deficit hyperactivity disorder (ADHD); major depressive disorder; unspecified anxiety disorder; oppositional defiant disorder (ODD); and post-traumatic stress disorder (PTSD). (Tr. 19). However, after reviewing the evidence in its entirety, the ALJ determined that the Plaintiff's impairments did not meet or equal the level of severity of any listed impairments described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1). (Tr. 19-22). The ALJ found Plaintiff retained the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with the following non-exertional limitations: Plaintiff was "able to perform unskilled work where interpersonal contact with coworkers and supervisors is only incidental to the work performed, there is no contact with the public, the complexity of tasks is learned and performed by rote with few variables and little use of judgment, and the supervision required is simple, direct, and concrete." (Tr. 22-33). Plaintiff had no past relevant work; however, with the help of a VE, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, such as cook helper, kitchen helper, sweeper cleaner, bin filler, gasket attacher/gluer, ordnance check weigher, and paper label assembler. (Tr. 33-34). Ultimately, the ALJ concluded that Plaintiff had not been under a disability within the meaning of the Social Security Act since September 10, 2015, the date the application was filed. (Tr. 34).

2

Subsequently, Plaintiff requested a review of the hearing decision by the Appeals Council, which denied that request on October 29, 2018.[2] (Tr. 1-7). Plaintiff filed a Petition for Judicial Review of the matter on December 21, 2018. (Doc. 1). Both parties have submitted briefs, and this case is before the undersigned for report and recommendation. (Docs. 11, 14).

The Court has reviewed the transcript in its entirety. The complete set of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

## II.    Evidence Submitted:

At the hearing before the ALJ on November 21, 2016, Plaintiff testified that she was born in 1997 and graduated from high school. (Tr. 89). Plaintiff was in special education classes in high school for Math and English. (Tr. 89). Testimony showed that Plaintiff did not have any past relevant work. (Tr. 90).

Prior to the relevant time period, Plaintiff was treated for upper respiratory infections, influenza, ear infections, abdominal pain from an ovarian cyst and dysmenorrhea, gastritis, gastroenteritis, depression, violent behavior, cystitis, dermatitis, cellulitis, urinary tract infection, right shoulder pain, strained tendon in foot/ankle, headaches, ADHD, oppositional and disruptive behaviors, trauma-related problems, learning issues, cognition issues, and memory problems.

---

[2] With respect to the additional evidence from the relevant time period that was submitted to the Appeals Council, the Appeals Council made the following determination, "We find this evidence does not show a reasonable probability that it would change the outcome of the decision. We did not exhibit this evidence." The Court notes that, here, as the Court found in Benoit v. Berryhill, although the Appeals Council denied Plaintiff's request for review and indicated that it did not consider or exhibit the evidence, the Appeals Council's decision reflects that the Appeals Council received the additional records; that it reviewed these records; and that it concluded that these records did not provide a basis for changing the decision of the ALJ. Benoit v. Berryhill, 2018 WL 4554519, at *7 (E.D. Mo. September 21, 2018).

As early as December of 2009, Plaintiff had a doctor visit at Dayspring Behavioral Health. (Tr. 889). Records indicated that she had a history of oppositional defiant disorder, impulse control disorder, ADHD, and adjustment disorder with depressed mood, and she was on medication at the time for the conditions. (Tr. 889). Dayspring records showed that Plaintiff's mother reported some improvement on the medication, such as a stabilization in Plaintiff's grades in February of 2011, an increase in calm behavior in November of 2010, and an improvement in her attention span in June of 2010. (Tr. 981-982, 984). Plaintiff underwent counseling and made some progress toward her goals but continued to struggle with oppositional defiance disorder and difficulty with authority and following rules. Her GAF scores remained between 38 and 55 during her services with Dayspring. She was discharged from Dayspring in October of 2012, and she was encouraged to continue working toward her goals and resume services with another outpatient mental health agency. (Tr. 913-914).

From December of 2011, until May of 2012, Plaintiff was inpatient at Pinnacle Point for labile moods, violent and aggressive behavior, combativeness with siblings, belligerent behavior, destructive behavior, and noncompliance with medication. (Tr. 1089). While at Pinnacle Point, Plaintiff was involved in individual, group and family treatment, as well as recreational therapy and educational classes. (Tr. 1091). At discharge, Plaintiff was no longer exhibiting or verbalizing ongoing depressive or aggressive symptoms and denied homicidal or suicidal ideation. Plaintiff was to follow up with her Dayspring mental health professionals. (Tr. 1091). Her discharge diagnosis was mood disorder, disruptive behavior disorder, and ADHD with a GAF score of 42. (Tr. 1092).

The medical record also indicated that Plaintiff was admitted to BridgeWay in July of 2012 for six days. (Tr. 994). Intake notes revealed that Plaintiff had also been hospitalized in

the past at Youth Villages (a residential setting) due to her impulsive and aggressive behaviors. (Tr. 997).  Plaintiff was showing severe aggression toward her developmentally delayed brother and also throwing things at her mother.  She was also noncompliant with her medications.  (Tr. 994). Plaintiff reported at intake that Plaintiff had hit one brother in the eye with an object and that she was showing aggression toward her brothers.  (Tr. 994-995).  She admitted to not taking her medication and stated that her mood was usually "good" but that she did experience anger on a daily basis.  (Tr. 995). Records indicated that Plaintiff attend group sessions while at BridgeWay; that she completed daily self-inventories and assignments on anger; and that she completed a risk assessment.  During inpatient, Plaintiff was noted to be sleeping well, not displaying any aggression, tolerating her medication, and in agreement to complying with her medication as an outpatient.  (Tr. 995).  Plaintiff's diagnosis upon discharge was disruptive behavior disorder, sexual abuse as a child, history of ADHD and a GAF score of 45.  (Tr. 996).

On September 11, 2012, Plaintiff underwent a psychoeducational evaluation by Jo Ella Peever, M.Ed., which showed that Plaintiff's overall level of achievement was very low; her math score was low average; her reading and written expression were in low range; and she had a significant deficit in the area of visual perception.  (Tr. 679).  Her adaptive behavior and functional skills assessment both indicated areas of statistical significance and were within expected ranges.  She demonstrated specific learning disabilities in basic reading skills, reading comprehension, reading fluency, math calculation skills, and written expression.  (Tr. 679).

On October 2, 2012, Jane Barrett, the speech pathologist at Plaintiff's school, completed testing on Plaintiff, which showed that Plaintiff's global language skills were within the average range for her age.  (Tr. 658-662).

The medical record also showed that Plaintiff was receiving individual psychotherapy services as early as August of 2014 at Counseling Associates, Inc. for major depressive disorder, oppositional defiant disorder, and relational problems; however, Plaintiff was discharged on July 24, 2015 for lack of contact with Plaintiff. (Tr. 870).

During the relevant time period, the medical record showed that on September 23, 2015, Stephanie Houston, Plaintiff's resource teacher, completed a teacher questionnaire. (Tr. 648-655). Ms. Houston indicated that based on her daily interaction with Plaintiff, she had an obvious problem in the area of acquiring and using information. (Tr. 649). Specifically, she struggled with working alone, required extra help, and needed a lot of structure and support overall. (Tr. 649). Ms. Houston noted that Plaintiff had a serious problem with attending and completing tasks and had to be kept on task and focused regularly. (Tr. 650). Plaintiff had a slight problem overall in interacting and relating to others. (Tr. 651). Plaintiff did not have any issues with moving about and manipulating objects. (Tr. 652). Lastly, Ms. Houston suggested that Plaintiff had a serious to very serious problem in the area of caring for herself. (Tr. 653).

On October 26, 2015, Andrea Edgmon, a social worker, completed a Function Report on Plaintiff's behalf. (Tr. 330-337). Edgmon reported that Plaintiff had limited adaptive living skills; that she had issues regarding interaction with others; that she would get angry and frustrated easily; that she had to be prompted to bathe; that she had no money management skills; and that she had no ability to follow complex directions. (Tr. 330). She noted that Plaintiff lived alone, but that she would get herself up, take the bus to and from school, occasionally have a friend pick her up to go to church, and stay around the camper until bedtime. (Tr. 330). She stated that Plaintiff would wear improper or ill-fitting clothing; that

6

she would only bathe once a week unless prompted; and that she did not care for her hair or shave. (Tr. 331). Plaintiff could prepare simple meals, and she was able to physically do housework. (Tr. 332). Ms. Edgmon noted that while Plaintiff did not drive and was unable to manage money, she was able to shop in stores for food and personal items. (Tr. 333). Plaintiff was social in that she liked to watch movies, go to church, and hang out with her little sister. (Tr. 334). However, she had trouble getting along with others, including verbal outbursts, becoming easily agitated, and displaying oppositional behavior. (Tr. 335). She could pay attention for five to ten minutes, could not finish what she started, and would get confused with instructions. (Tr. 335). Ms. Edgmon noted that Plaintiff was not on any medication at the time she completed the report. (Tr. 337).

On October 28, 2015, Plaintiff underwent a mental diagnostic evaluation by Dr. Steve Shry, Ph.D. (Tr. 693-695). Initially, Plaintiff's social worker, who was also interviewed, reported Plaintiff's issues with independent living, poor decision making, and anger management. Dr. Shry noted Plaintiff's diagnosis of major depressive disorder and oppositional defiant disorder through Counseling Associates. Plaintiff denied inpatient treatment, said she was not currently on medication, and reported a lack of medical insurance and financial resources. (Tr. 693). Dr. Shry observed that Plaintiff was pleasant but passive and non-spontaneous; was cooperative; had a normal and stable mood; had a normal speech pattern; affect was mood congruent; had a normal range of expression; had liner and relevant responses; had well-connected and goal directed associations; and had no evidence of psychotic process. (Tr. 693-694). Dr. Shry noted that Plaintiff was oriented to time, place and person; that she did not appear to demonstrate any unusual mannerisms or behaviors; that she was able to cite basic biographical information, but incorrectly cited other information; that

7

she had received psychiatric treatment but was not on any mediation; and that she appeared to meet the diagnostic criteria for specific learning disorder and borderline intellectual functioning (Tr. 694-695). Dr. Shry concluded that Plaintiff was poorly groomed but was pleasant and did not appear to be impaired in her ability to communicate and interact in a socially adequate manner. (Tr. 695). Dr. Shry opined that she could communicate in an intelligible and effective manner; that she did not appear to be significantly impaired in her ability to cope with the typical demands of basic work like tasks when the tasks were simple, but due to her learning disorder and her intellectual functioning, she might be significantly impaired in this area when tasks were complex; that she attended well and did not seem impaired in her ability to attend and sustain concentration on tasks; that she did not tolerate frustration well and would likely demonstrate significant impairment in her ability to sustain persistence when completing tasks when under stress due to her intellectual function level; and she did not appear to be impaired in her ability to complete simple work like tasks within an acceptable time frame, but could be impaired in this area if tasks were complex. (Tr. 695).

On November 30, 2015, Dr. Sheri L. Simon, Ph.D., a non-examining medical consultant, completed a mental RFC assessment where she determined that Plaintiff had the capacity for work where interpersonal contact was incidental to work performed, e.g. assembly work; complexity of tasks was learned and performed by rote, few variables, little judgment; and supervision required was simple, direct and concrete (unskilled). (Tr. 162).

Instructor, Ms. Debbie McBurney, completed a Communications Assessment on Plaintiff on December 7, 2015, as part of an overall psychological and speech and language evaluation at Forrester-Davis Developmental Center. (Tr. 1284). Ms. McBurney stated that Plaintiff "needed prompts" when handling situations involving conflict or anger, but that she

was able to independently handle the majority of various types of social communication and interaction. (Tr. 1284-1287). Other instructors noted Plaintiff's need for prompts in areas of exercise, nutrition, and some social community. (Tr. 1295-1299).

On March 25, 2016, Dr. Kay M. Gale, a non-examining medical consultant, completed a mental RFC assessment where she affirmed Dr. Simon and determined that Plaintiff had the capacity for work where interpersonal contact was incidental to work performed, e.g. assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; and supervision required was simple, direct and concrete (unskilled). (Tr. 180).

On April 13, 2016, Plaintiff resumed counseling at Counseling Associates with Dr. Mervin Leader. (Tr. 1115). Plaintiff's Intake Assessment indicated problems with physical, emotional and sexual abuse resulting in trauma. (Tr. 1115). Plaintiff reported that she was currently residing with her aunt and uncle because she was unable to get along with her mother. (Tr. 1116). She stated that she attended church services with her family, but she did not interact with her peers outside of school. The examiner noted that Plaintiff had a cooperative attitude, was well-groomed, had a normal mood, intact short-term memory, fair judgment and insight, appropriate behavior and affect, and posed no risk of violence. (Tr. 1116). Plaintiff was diagnosed with PTSD. (Tr. 1116).

During Plaintiff's counseling session on April 20, 2016, Dr. Leader noted that her judgment and insight were fair. (Tr. 1117). On April 27, 2016, Plaintiff opened up to Dr. Leader about her history of sexual abuse and her sexual abuse of her brothers. She explained that she had worked through the abuse in counseling and did not need further treatment for that issue. (Tr. 1118). At her May 11, 2016, session, Plaintiff's uncle reported to Dr. Leader that

he was concerned about Plaintiff's attention seeking behavior and that she had been messaging men and giving them her personal information. (Tr. 1120). At her May 19, 2016, session, she reported that she had been staying with her mother for a week and that it was going "fairly well." (Tr. 1119). Plaintiff was also excited about her upcoming graduation. (Tr. 1119).

At Plaintiff's June 2, 2016, session with Dr. Leader, Plaintiff's uncle joined her, and they discussed her relationship with her mother. (Tr. 1121). At her June 6, 2016, session Plaintiff and Dr. Leader discussed choosing her battles with those around her, and Dr. Leader's notes indicated that Plaintiff left that session feeling more relaxed. (Tr. 1122).

At a June 15, 2016, annual physical by Dr. Noonan, Plaintiff was noted to have good judgment and insight; she was oriented to time, place, and person; and her recent and remote memory were normal. (Tr. 1206).

At a counseling session on June 16, 2016, Plaintiff shared with Dr. Leader that she was hopeful about getting a job and taking classes that would help her learn to live on her own. (Tr. 1123). She reported to Dr. Leader that her relationship with her mother had improved since she was living with her uncle. (Tr. 1123). Plaintiff shared again on June 23, 2016, that things with her mother were still improving, but that she was concerned about her terminally ill father. (Tr. 1124). She and Dr. Leader discussed the impact on her of her mother kicking her out when she was only twelve. Plaintiff was concerned about her future, but left the session feeling more relaxed. (Tr. 1124).

In September through December of 2016, Plaintiff underwent testing and evaluations by Dena Baker, M.S., a licensed psychological examiner with Arkansas Rehabilitation

Services, Nina Floyd, M.S. a licensed psychological examiner, Dr. Robert Noonan, and Dr. Steve Shry.

Beginning in September of 2016, Plaintiff underwent a Rehabilitation Initial Diagnosis and Assessment and Psychological Screening Report by Dena Baker.  (Tr. 986-990).  Ms. Baker administered the Wide Range Achievement Test – Fourth Edition, Ohio Literacy Test, Beta III, Written Language Assessment, Wonderlic Scholastic Level Exam, and Holland's Self-Directed Search.  (Tr. 986).  Plaintiff reported average grades in high school and special education classes for English and Math.  (Tr. 986). Plaintiff endorsed that her disabilities included learning disability, oppositional defiant disorder, and attention deficit/hyperactivity disorder (ADHD) (which she was diagnosed with in early childhood). (Tr. 986-987).  Plaintiff reported that she gets distracted a lot, moves around a lot, and talks too much.  (Tr. 987).  She stated that she had difficulty with concentration, forgetfulness, misplacing items frequently, impulsivity, high energy levels, poor organizational skills, and susceptibility toward making careless mistakes.  (Tr. 987). Plaintiff denied difficulty with following through on tasks in an efficient manner, depressed mood, suicidal ideation, unexplained crying spells, or anhedonia, but she reported problems with sleep, poor self-esteem, and irritability.   Plaintiff felt that her obedience had improved but admitted continuing conflict and aggression toward her mother and younger brother.  Her behavior was better at school than at home, and she had not been suspended for behavioral difficulties.  (Tr. 987). Ms. Baker described Plaintiff as pleasant, cooperative, and putting forth good effort, but noted that she required individual instruction when presented with unfamiliar tasks.  She noted her seemingly normal affect and energy levels, her ability to express herself verbally, and the lack of evidence of a thought disorder. (Tr. 988).  Plaintiff's test scores indicated borderline abilities, specifically her Beta III test

11

score of 72 (indicating borderline abilities when evaluating selected skills in the area of nonverbal intelligence and visual-motor development) and her Wonderlic score of 65 (indicating deficient abilities when testing general cognitive ability or the level in which an individual learns, understands instructions, and solves problems). (Tr. 988-989). Ms. Baker diagnosed Plaintiff with oppositional defiant disorder and ADHD. (Tr. 989). Ms. Baker noted that Plaintiff was not currently participating in mental health services, but that she planned to resume counseling in the next month. (Tr. 990). With test results showing borderline to deficit intellectual and academic skills, Plaintiff would be unlikely to successfully complete college level coursework or skilled vocational training, but she would be likely to be able to complete unskilled vocational tasks if taught in a "hands-on" training environment. Ms. Baker noted that supported employment and work readiness programs would be needed. (Tr. 990). Plaintiff's interest inventory results indicated that Plaintiff would prefer vocational activities with artistic and social characteristics, including jobs as a day care worker, housekeeper, manicurist, usher, food preparation technician, and caterer helper. (Tr. 990).

Nina Floyd's evaluation of Plaintiff was on October 20, 2016. (Tr. 763). Ms. Floyd noted that Plaintiff was currently living with her uncle and his family and that Plaintiff reported that her mother had problems with drugs for most of Plaintiff's life. Ms. Floyd noted that Plaintiff did not have any physical medical problems and did not take any medication at the time. (Tr. 763). However, Ms. Floyd also noted that Plaintiff qualified for special education services due to her learning disability and emotional disturbance, and that Plaintiff was further diagnosed with ADHD, oppositional defiant disorder, reactive attachment disorder, and depression. (Tr. 763). After testing, Ms. Floyd opined that Plaintiff's full-scale IQ represented overall impairment in general intellectual ability and her adaptive behavior skills indicated

substantial functional limitations in the areas of self-care, understanding and use of language, self-direction, capacity for independent living, and learning. (Tr. 766). Specifically, Plaintiff received a full-scale IQ of 59 on the Wechsler Adult Intelligence Scale – Fourth Edition and scored 62 on the Vineland Adaptive Behavior Scales, Second Edition. (Tr. 763, 766). Ms. Floyd noted Plaintiff's uncle and his wife had to remind Plaintiff to shower, wash, and brush her hair and teeth. She also noted that testing showed that Plaintiff did not have the ability to manage finances, plan and prepare meals, shop for food and other needs, or perform household chores, and that she could be easily manipulated and taken advantage of by others. (Tr. 766).

Dr. Robert Noonan completed a Mental RFC Assessment on Plaintiff on November 18, 2016, wherein he noted that she had no useful ability to function on a sustained basis in the following areas: completing a normal workday and workweek without interruptions from psychologically based symptoms; interacting appropriately with the general public; behaving in an emotionally stable manner and/or relating predictably in social situations; and working without deterioration or decompensation causing exacerbation of symptoms or adaptive behaviors. (Tr. 1125).

On December 13, 2016, Dr. Steve Shry completed an additional Mental Diagnostic Evaluation and Psychometric Evaluation. That day, Plaintiff seemed pleasant and friendly, but also somewhat passive. (Tr. 1127). She was warned to try her best at the beginning of testing when it was noted that she was rapidly responding with seemingly little thought. Overall, Plaintiff demonstrated a normal and stable mood; her affect was mood congruent; and her speech was normal. Plaintiff's responses were logical, relevant, and her associations were connected and goal directed. She did not evidence any psychotic process. (Tr. 1127). Dr. Shry noted that Plaintiff's full-scale IQ from the Wechsler testing was 71. (Tr. 1127). Dr. Shry's

diagnostic impressions were specific learning disorder, mild to moderate, and borderline intellectual functioning. (Tr. 1128). Plaintiff reported that she was capable of handling her own personal hygiene and dressing; that she was able to perform household chores and shop with some assistance; that she had some difficulty with managing her finances based on her trouble with math; that she was able to participate with social groups; and that she did not have a driver's license. (Tr. 1128). Dr. Shry observed that Plaintiff did not appear to be significantly impaired in her ability to communicate and interact in a socially appropriate manner; that she could communicate in an intelligible and effective manner; that she could comprehend and carry out simple tasks, but that due to her intellectual functioning level she might have mild to moderate impairment when tasks are complex; that Plaintiff attended well when motivated to do so; that she did not appear to tolerate frustration well during the evaluation and thus, she might be significantly impaired in her ability to sustain persistence when completing tasks; and that she did not seem to be impaired in her ability to complete simple work-like tasks within an acceptable time frame, but appeared to be mildly impaired when the tasks were complex due to her intellectual functioning level. (Tr. 1129). Dr. Shry also completed a Medical Source Statement (Mental), which mirrored the findings from his evaluation. (Tr. 1132-1133).

Meanwhile, in October of 2016, Plaintiff returned to Counseling Associates for a Mental Health Evaluation, where she was given a diagnosis of major depressive disorder, oppositional defiant disorder, and unspecified anxiety disorder. (Tr. 878-879). Additional individual counseling was recommended. (Tr. 881). At an October 28, 2016, session, Plaintiff reported that her father had passed the night before; however, she said the two were not very close. (Tr. 1184). She was making progress with her anger and her relationship with her younger brother. She was currently romantically interested in a boy and was excited about an

14

upcoming sleepover with a friend. (Tr. 1184).    At her November 2016 therapy session, Plaintiff reported no anger outbursts and worked her way through situations with new learned self-talk. Plaintiff also reported that she was getting along well with her uncle, other siblings and people at work. Plaintiff was also attending church. (Tr. 1181).

In November and December of 2016, Plaintiff's therapy sessions focused on her mother and how she continued to be upset by the death of Plaintiff's father; on how Plaintiff was working through her anger and frustration in productive ways; and on how Plaintiff was working on self-esteem and anger management. (Tr. 1172-1178). At her January 13, 2017 session, therapy notes indicated Plaintiff was stable with no improvement or regression. (Tr. 1169).    At her second January session and her February session, Plaintiff and Dr. Leader focused on anger issues and self-talk.  (Tr. 1163-1166).

Previously, on November 18, 2016, Plaintiff reported to Dr. Robert Noonan at the Clarksville Family Medical Center that her mood had worsened, and her anxiety had increased. (Tr. 1202).  However, in December of 2016, Plaintiff told Dr. Noonan that her depression symptoms had improved on her medication, and Dr. Noonan noted that day that Plaintiff was attentive, active and alert. (Tr. 1200).  In February of 2017, while undergoing counseling at Counseling Associates, Plaintiff shared with Dr. Noonan that she had stopped taking her anxiety/depression medication over a month ago and reported and was unable to maintain relationships.

At Counseling Associates on March 24, 2017, Plaintiff and her therapist focused on acknowledging her self-worth.  (Tr. 1160).  In May of 2017, Plaintiff reported some progress with family relationships.  (Tr. 1151, 1154, 1157).

15

In June, July and August of 2017, Plaintiff and Dr. Leader discussed her living situation with her aunt and uncle; addressed on-going issues with her mother, including neglect; addressed how to react in an emergency situation and how to handle her mother's lack of assistance; and addressed issues at work and how Plaintiff could respond to them. (Tr. 1134, 1139, 1142, 1145, 1148). In August of 2017, Plaintiff and her counselor discussed how things were going well for Plaintiff. (Tr. 1142).

On September 1, 2017, Stephanie Metcalf, APRN, at the Clarksville Family Clinic completed a Medical Source Statement, wherein she opined that Plaintiff had no useful ability to function on a sustained basis in the following areas: maintaining attention and concentration for extended periods of time; functioning independently and/or sustaining an ordinary routine without supervision; working in coordination with or in proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; maintaining socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; setting realistic goals or making plans independently of others; and working without deterioration or decompensation causing exacerbation of symptoms or adaptive behaviors. However, Nurse Metcalf did not provide any objective findings to support her assessment, and Nurse Metcalf's clinic notes do not indicate any support for the limitations set forth in the check box form. (Tr. 1185). Rather, her notes indicated that Plaintiff's mood and affect were normal, and she was active and alert. (Tr. 1190).

At her counseling sessions in September and October of 2017, Plaintiff continued to work on her anger management. (Tr. 1188). On October 9, 2017, Plaintiff stated during her

yearly review at Counseling Associates that she was satisfied with her services and did not want to change her level of care.  Review notes indicated that Plaintiff participated fully in the review of her treatment goals, objectives, services, and progress during ongoing session discussions.  It was also noted that Plaintiff attended nearly all sessions as scheduled and was making improvement.  (T. 1215).

The following therapy records from Counseling Associates were submitted to the Appeals Council after the ALJ had issued a decision. The Appeals Council reviewed this medical evidence before denying review.  Beginning on October 25, 2017, Plaintiff's therapy notes indicated that she revealed further incidents of abuse and neglect in her childhood and that she was learning how to voice her angry feelings and let the feelings pass, rather than acting out.  (Tr. 78).  On November 7, Plaintiff continued to work through her anger and her feelings of being the last to be cared for in her uncle's house, and Plaintiff became euthymic after her counselor helped her get a plan in place to address the issue.  (Tr. 75).   At a second session in November, Plaintiff's counselor noted she made good progress that day.  (Tr. 72).  In December, Plaintiff and her counselor continued to work on her family relationships, and she showed progress by holding herself back when she felt she was going to get angry.  (Tr. 65).  Overall, Plaintiff reported that she was "doing well."  (Tr. 66).  In January, February, and March, Plaintiff continued to address her relationship issues with her uncle, boyfriend, mother and co-workers, and to address her anger management issues.  During these months, Plaintiff reported success in using healthier means to process her anger, such as self-talk, and in March, she reported good relationships with her uncle, boyfriend and brothers.  (Tr. 51, 63).

### III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(C).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

18

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. § 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her RFC. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 416.920.

## IV.    Discussion:

Plaintiff makes the following arguments on appeal: 1) that the ALJ erred in failing to fully and fairly develop the record; 2) that the ALJ erred at Steps Two and Three in his evaluation of Plaintiff's multiple mental disorders and their combination; 3) that the ALJ erred in assessing Plaintiff's subjective complaints; and 4) that the ALJ erred in his RFC determination.  (Doc. 11, pp. 7-20).

### A.    Full and Fair Development of the Record:

The ALJ has a duty to fully and fairly develop the record. See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1995).  The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press her case. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010). The ALJ, however, is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record. "Reversal due to failure to develop the record is

only warranted where such failure is unfair or prejudicial." Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995). "While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).

In this case, the record consists of mental RFC assessments completed by non-examining medical consultants; a consultative mental examination by Dr. Steve Shry, Ph.D.; a September 2016 psychological screen report by Dena Baker, M.S.; an October 2016 Psychological Evaluation For Eligibility of Services from Nina Floyd, M.S.; a second, post-hearing consultative mental examination by Dr. Shry; and Plaintiff's medical records, which included clinic notes from various physicians, therapy records, and mental health inpatient records. After reviewing the entire record, the Court finds the record before the ALJ contained the evidence required to make a full and informed decision regarding Plaintiff's capabilities during the relevant time period. Accordingly, the undersigned finds the ALJ fully and fairly developed the record.

### B.    Plaintiff's Impairments:

At Step Two of the sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe. See 20 C.F.R. § 404.1520(c). While "severity is not an onerous requirement for the claimant to meet ... it is also not a toothless standard." Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015) (citations omitted). To be severe, an impairment only needs to have more than a minimal impact on a claimant's ability to perform work-related activities. See Social Security Ruling 96-3p. The claimant has the burden of proof of showing he suffers from a medically-severe impairment at Step Two. See Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000).

While the Plaintiff only alleged "mental illness" as an alleged impairment, the ALJ specifically discussed the alleged mental impairments in the decision, and clearly stated that he considered all of Plaintiff's impairments, including the impairments that were found to be non-severe. See Swartz v. Barnhart, 188 F. App'x 361, 368 (6th Cir. 2006) (where ALJ finds at least one "severe" impairment and proceeds to assess claimant's RFC based on all alleged impairments, any error in failing to identify a particular impairment as "severe" at step two is harmless); Elmore v. Astrue, 2012 WL 1085487 *12 (E.D. Mo. March 5, 2012); see also 20 C.F.R. § 416.945(a)(2) (in assessing RFC, ALJ must consider "all of [a claimant's] medically determinable impairments ..., including ... impairments that are not 'severe' "); § 416.923 (ALJ must "consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity"). After reviewing the record as a whole, the Court finds the ALJ did not commit reversible error in setting forth Plaintiff's severe impairments during the relevant time period.

### C.    Combination of Impairments:

Plaintiff alleges that the ALJ erred in failing to consider all of the Plaintiff's impairments in combination.  (Doc. 11, p. 13).  The ALJ stated that in determining Plaintiff's RFC, he considered "all of the claimant's impairments, including impairments that are not severe."  (Tr. 18).  The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.  (Tr. 19).  Such language demonstrates the ALJ considered the combined effect of Plaintiff's impairments.  Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994).

### D.      Evaluation of the Listed Impairments:

Plaintiff appears to argue the ALJ erred by failing to determine that Plaintiff's impairment medically equals Listing 12.05 - Intellectual Disability.  (Doc. 11, pp. 13-15).  The burden of proof is on the Plaintiff to establish that her impairment meets or equals a listing. See Sullivan v. Zebley, 493 U.S. 521, 530-31, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). To meet a listing, an impairment must meet all of the listing's specified criteria. Id. at 530, 110 S.Ct. 885 ("An impairment that manifests only some of these criteria, no matter how severely, does not qualify."); Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). "Medical equivalence must be based on medical findings." 20 C.F.R. § 416.926(b) (2003); Sullivan, 493 U.S. at 531 ("a claimant ... must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment"). In this case, the ALJ considered the "B" and "C" criteria and found that Plaintiff did not satisfy either set of criteria. The ALJ determined that Plaintiff had moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  (Tr. 20-21).

While Plaintiff argues the ALJ erred in failing to discuss Plaintiff's full-scale IQ test score of 59 from Nina Floyd, a review of the ALJ's decision showed that the ALJ addressed Plaintiff's full-scale IQ test scores of 59 from Nina Floyd as well as her full-scale IQ score of 71 from Dr. Shry.  The Eighth Circuit Court of Appeals has emphasized in the past that an IQ test is useful in determining whether an applicant has a mental impairment, but other information in the record which indicates the individual's ability to function can be used to discredit the lone IQ score. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004); Holland v. Apfel, 153 F.3d 620, 621–22 (8th Cir. 1998).   Furthermore, the Commissioner is not

required to accept a claimant's IQ scores, and may reject scores that are inconsistent with the record. Scott ex rel. Scott v. Astrue, 529 F.3d 818, 824 (8th Cir. 2008); Johnson v. Barnhart, 390 F.3d at 1071; Miles v. Astrue, 374 F.3d 694, 699 (8th Cir. 2004); Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998). Indeed, test results of this sort should be examined to assess consistency with daily activities and behavior. Id.

In this case, the record as a whole indicates that Plaintiff does not suffer from deficits in adaptive functioning sufficient to satisfy this listing. As indicated by the ALJ, Dr. Shry opined that Plaintiff had no limitation in her ability to understand, remember, and carry out short, simple instructions, but that she had difficulty with detailed instructions; that Plaintiff did not seem to have difficulty comprehending and carrying out simple tasks and did not appear to be significantly impaired in her ability to cope with the typical demands of basic tasks when the tasks were simple and not complex. (Tr. 20). Dr. Shry also opined that in the 2016 evaluation Plaintiff denied difficulty participating in social groups, and Dr. Shry opined that Plaintiff did not have any significant impairment in her ability to communicate in a socially appropriate manner; however, the ALJ also noted Plaintiff's treatment history notes focusing on Plaintiff's relational issues with her family members and her issues with anger and aggression. (Tr. 20). The ALJ noted Dr. Shry's opinion that Plaintiff had no significant impairment in her ability to attend and sustain concentration on simple tasks, but possibly some significant impairment with completing tasks; that Plaintiff had mild impairment in her ability to complete simple work-like tasks within acceptable timeframes when the tasks were complex. (Tr. 21). The ALJ also considered Plaintiff's report that she did not regularly bathe, care for her hair, or shave, and her counselor's note that hygiene was a problem. Plaintiff reported that she needed reminders for these things, and her uncle confirmed that reminders

were necessary.  (Tr. 21). Plaintiff also reported however, that she prepared her own simple meals, including sandwiches, microwave meals, and meals on the stove daily; that she was able to do chores such as washing dishes, sweeping and mopping the floor, picking up the yard, and vacuuming; that she did a little house cleaning daily but was easily distracted; that she used public transportation; and that she shopped in stores when she had the money.  (Tr. 23, 313-316).  Plaintiff further noted that she spent time with others including going to church, helping her little sister, and going to the movies with her grandmother.  (Tr. 23, 314-316). Plaintiff also indicated in her two pain questionnaires that she was not taking any medication. (Tr. 23).

Non-examining medical consultants also determined that Plaintiff did not meet or equal a Listing. (Tr. 162, 180). The ALJ is entitled to rely on the opinions of reviewing physicians when considering whether the claimant meets the requirements of a listed impairment. Ostronski v. Chater, 94 F.3d 413, 417 (8th Cir. 1996). After reviewing the record as whole, the Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff did not meet or equal a Listing.

E.    **Combination of Impairments:**

Plaintiff argues that the ALJ erred in failing to consider all of the claimant's impairments in combination.  (Doc. 11, pp. 13-15).  The ALJ stated that in determining Plaintiff's RFC he considered "all of the claimant's impairments, including impairments that are not severe." (Tr. 25). The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (Tr. 27). Such language demonstrates the ALJ considered the combined effect of Plaintiff's impairments. Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994).

F.       **Subjective Complaints and Symptom Analysis:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards, 314 F.3d at 966.

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. In addressing Plaintiff's credibility, the ALJ noted Plaintiff's report that she was unable to work due to her mental illness.  She testified that she struggled with getting along with her family members, particularly with her mother, and was currently living with her uncle and aunt.  (Tr. 94).  She stated that her uncle had to remind her to shower, had to remind her to wear proper clothing, and had to give her specific instructions.  (Tr. 95).  Plaintiff testified she was able to help out around the house and could prepare simple meals.  (Tr. 105).  Plaintiff's uncle testified that Plaintiff moved in with him to avoid going to a homeless shelter; that Plaintiff needed reminders for hygiene and medication; and that Plaintiff struggled with anger management.  (Tr. 100-108).  Plaintiff's social worker completed a Function Report, wherein she also indicated that hygiene was a problem for Plaintiff.  (Tr. 331).

In the September 14, 2015, Function Report, Plaintiff reported that she was living alone in a camper on a friend's property, and her daily activities included waking at 7 a.m., getting ready for school, riding the bus to and from school, cleaning, and getting ready for bed.  (Tr. 312-313).  She reported that her mental illness impacted her sleep; that she struggled with personal hygiene; that she needed reminders for personal care and medication; that she prepared simple meals daily; and that she would do several household chores.  (Tr. 313-314).  She stated that she did not drive and that she was not able to manage money.  However, her hobbies and social activities included going to church, helping with her little sister, and going to the movies.  (Tr. 314-316). She stated that she could only pay attention for a few minutes; that she could follow written instructions "pretty well;" and that she did not follow verbal instructions very well. (Tr. 317). Plaintiff's uncle and her social worker also completed function reports that mirrored Plaintiff's responses.  (Tr. 355-362, 330-337).

With respect to Plaintiff's mental impairments, the record demonstrates that Plaintiff was treated conservatively with medication and individual and group therapy.  The record also demonstrates that while Plaintiff had inpatient treatment as early as 2009 (prior to the relevant time period), she did not have any inpatient treatment during the relevant time period.  Plaintiff began attending outpatient therapy at Counseling Associates as early as April of 2014 and continued therapy throughout the relevant time period.  The medical record also showed that Plaintiff's medication and therapy were helpful at times and that her mental health conditions improved somewhat with treatment on occasion.  Impairments that can be controlled with treatment or medication are not disabling. See Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002).

Plaintiff also contends that the ALJ failed to consider the third-party statements of others.  While the ALJ is "not required to accept all lay testimony ... it is almost certainly error to ignore it altogether." <u>Willcockson v. Astrue</u>, 540 F.3d 878, 881 (8th Cir. 2008); <u>Smith v. Heckler</u>, 735 F.2d 312, 316–17 (8th Cir.1984) (finding that ALJ's failure to mention three lay witnesses' affidavits suggested that the ALJ overlooked them).  However, the ALJ may discount third-party testimony on the same grounds as he or she discounts a claimant's own testimony. <u>Black v. Apfel</u>, 143 F.3d 383 at 387.   Moreover, failure to specifically discuss and cite evidence does not mean that it was not considered by the ALJ. <u>Wildman v. Astrue</u>, 596 F.3d 959, 966 (8th Cir.2010) (citation omitted).  In the particular case, the Court does not find the ALJ's failure to specifically address third-party statements reversible error as the same grounds used to discount Plaintiff's testimony also discount the third-party statements.

Although it is clear that Plaintiff suffers some degree of limitation, she has not established that she is unable to engage in any gainful activity. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

**G.     ALJ's RFC Determination:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). It is assessed using all relevant evidence in the record. <u>Id</u>. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005); <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a

"claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect h[er] RFC." Id.

In the present case, when determining that Plaintiff could perform unskilled work, the ALJ considered the relevant medical records, the medical opinions from treating and non-examining physicians, and set forth the reasons for the weight given to the opinions. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians")(citations omitted); Prosch v. Apfel, 201 F.3d 1010 at 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole).

Plaintiff argues that the ALJ's opinion was erroneously based on the two non-examining medical consultants and the reports from Dr. Shry.  In deciding whether a claimant is disabled, the ALJ considers medical opinions along with "the rest of the relevant evidence" in the record. 20 C.F.R. § 416.927(b). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007), citing Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001) (internal citations omitted).

28

As for non-examining medical consultants Dr. Sheri Simon, Ph.D., and Dr. Kay Gale, both opined in November of 2015 and March of 2016, respectively, that Plaintiff had the mental RFC to perform work where interpersonal contact with coworkers and supervisors was only incidental to the work performed, e.g. assembly work; the complexity of tasks was learned and performed by rote with few variables and little use of judgment; and the supervision required was simple, direct and concrete. (Tr. 162, 180). The ALJ did not incorporate the medical consultants' opinions verbatim but instead, added to those findings that Plaintiff should have no contact with the public. Based on a review of the record, which demonstrated Plaintiff's diagnosis of oppositional defiant disorder, her ongoing treatment focused on her relationship issues with both family and co-workers, and her anger issues toward others, substantial evidence supported the ALJ's RFC determination.

As for Dr. Shry's two consultative mental evaluations of Plaintiff, in the first evaluation in 2015, Dr. Shry concluded that Plaintiff did not appear to be impaired in her ability to communicate and interact in a socially adequate manner; that she could communicate in an intelligible and effective manner; that she did not appear to be significantly impaired in her ability to cope with the typical demands of basic work like tasks when the tasks were simple; that she attended well and did not seem impaired in her ability to attend and sustain concentration on tasks; that she did not tolerate frustration well and would likely demonstrate significant impairment in her ability to sustain persistence when completing tasks when under stress due to her intellectual function level; and she did not appear to be impaired in her ability to complete simple work like tasks within acceptable time frame. (Tr. 695). In his 2016 evaluation, Dr. Shry's conclusions were very similar to those from 2015. (Tr. 1129). The ALJ considered and gave substantial weight to both of Dr. Shry's evaluations as Dr. Shry was able

to evaluate the Plaintiff in-person on both occasions; the opinions were largely consistent with each other despite the fact that one was fourteen months prior to the other; and they were consistent with the objective medical and other evidence in the record as a whole. The Court finds that the ALJ did not err in weighing Dr. Shry's opinions.

Plaintiff also specifically mentions the weight given to the Medical Source Statements completed by Dr. Noonan and Nurse Metcalf. After review, the Court finds that the ALJ did not err in discounting the opinions of Dr. Noonan and Nurse Metcalf. The ALJ declined to give great weight to these opinions for good and well-supported reasons. See Goff v. Barnhart, 421 F.3d 785, 790–91 (8th Cir. 2005) ("[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount [the treating physician's] opinion."). Furthermore, the Eighth Circuit has stated that a conclusory checkbox form has little evidentiary value. See Anderson v. Astrue, 696 F.3d 790 (8th Cir. 2012); Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010); Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) (checklist format, generality, and incompleteness of treating physician's assessments limited their evidentiary value); see also Mason v. Shalala, 994 F.2d 1058, 1065 (3rd Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."). In the checkbox form, neither Dr. Noonan nor Nurse Metcalf provided objective evidence to support their opinions. Further, the ALJ found that the overall evidence did not support Dr. Noonan's or Nurse Metcalf's opinions rendered in the checkbox forms.

Plaintiff also specifically mentions the evaluations by Ms. Baker and Ms. Floyd. The record showed that the ALJ considered the opinions of both evaluators and gave some weight to Ms. Baker and little weight to Ms. Floyd. As previously set forth, the ALJ may reject the

conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.  See Prosch, 201 F.3d at 1012.

Lastly, to the extent Plaintiff argues that the ALJ failed to properly consider the entire body of evidence regarding Plaintiff's mental health treatment, the ALJ need not discuss every piece of medical evidence of record.  See Renstrom, 680 at 1064–65 (citing Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) ("Although required  to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.").

Upon careful review of the record as a whole, the Court finds that Plaintiff's arguments are without merit and that substantial evidence supports the ALJ's RFC determination.

**H.    Hypothetical Question to the Vocational Expert:**

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).  Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude her from performing work as a cook helper, a kitchen helper, a sweeper cleaner, a bin filler, a gasket attacher (gluer), an ordnance check weigher, and a paper label assembler.  (Tr. 112-113).  Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

## V.    Conclusion:

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 11th day of December, 2019.


/s/ *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE